[Cite as *State v. Torres*, 2026-Ohio-2729.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

ALLEN GENE TORRES,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 25 MA 0099

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2024 CR 00193

**BEFORE:**
Cheryl L. Waite, Carol Ann Robb, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Lynn Maro*, Mahoning County Prosecutor, and *Atty. Kristie M. Weibling*, Assistant Prosecutor, for Plaintiff-Appellee

*Atty. Brian A. Smith*, Brian A. Smith Law Firm, LLC, for Defendant-Appellant

Dated: July 15, 2026

---

**WAITE, P.J.**

**{¶1}** Appellant Allen Gene Torres appeals an October 9, 2025 judgment entry of the Mahoning County Court of Common Pleas convicting him of various offenses related to a shooting. On appeal, Appellant limits his argument to a challenge of the victim's identification of him as his assailant. A photograph and video were shown to the victim while he was hospitalized. Appellant contends his right to a fair trial was violated, as together, the images were unduly suggestive that Appellant was the perpetrator. For the reasons that follow, Appellant's argument is without merit and the judgment of the trial court is affirmed.

Factual and Procedural History

**{¶2}** This matter arises from a shooting that occurred at Slick's Bar and Grill ("Slicks") in the early hours of New Year's Day in 2024. The victim, D.S., entered the bar with a group of friends. On entering, he noticed a group of people sitting at the bar near the entrance to the women's bathroom. Among this group were two females and a male. D.S. took an interest in one of the women and approached the group to speak with her. At times he also attempted to speak to the man in the group, however, the man did not have much interest in conversing and did not respond to D.S. At some point, D.S. left the group to get money from a friend so he could buy the woman a drink. When he returned with the money, the man shot him in the stomach.

**{¶3}** Law enforcement sought to interview D.S. soon after the shooting in an attempt to identify the shooter. However, D.S.'s condition did not allow for an interview until three days after the shooting. Prior to the interview, police obtained fairly high resolution security video from the bar. Detective George Anderson and Detective

Sergeant Michael Cox reviewed the video. While the actual shooting was not caught on camera, police observed Appellant had a magazine intended for a pistol in his pocket shortly after the shots can be heard on the video. This led the officers to believe Appellant, who was apparently known to Det. Cox, may be the shooter.

{¶4} On January 2, 2024, Det. Anderson and Detective Philip Skowron conducted a hospital interview of D.S. The officers set up what appears to be a body camera that captured this interview on video. Det. Anderson first asked D.S. to provide a physical description of the shooter and his attire without informing him that police had a suspect in mind. D.S. admitted that he had difficulty in describing the shooter but was adamant that he could identify him if he saw his face.

{¶5} However, he eventually described his assailant as a "light-skinned dude" but "definitely black." As to his clothing, he explained "I can't necessarily remember, I think he was wearing grey pants or something of that sort. And I think he had dreads." (Body Camera, 2:51.) When again asked about the shooter's clothing, D.S. became frustrated and said "that's what I'm saying. It sucks because I really don't remember. I think he had dreads. I mean he was black, for sure. He had a red hoodie." (Body Camera, 4:10.) Asked again if he thought the man was wearing a red hoodie, he said "I think so." (Body Camera, 4:32.) He then stated: "I mean if I seen [sic] his face, I'd be able to tell you exactly who it is." (Body Camera, 4:37.)

{¶6} Det. Anderson showed D.S. a photograph of Appellant, their suspect at the time, and asked if the person depicted could be the shooter. The photograph contains the image of a dark, shadowed figure and does not provide a clear view of the shooter's face. When shown the photograph, D.S. took a relatively long time, approximately fifteen

seconds, trying to make out the figure in the photograph. He eventually responded: "I think so, that's not the bar owner, right?" He reviewed the photograph a second time and stated, "I think that is him." (Body Camera, 6:33.)

{¶7} Following this, Det. Anderson showed D.S. the surveillance video from the bar. We again note that the video does not depict the actual shooting, however, it does show the main bar area and the door leading outside during the shooting and the moments that followed. When shown the video D.S. immediately recognized Appellant. Within seconds of viewing this video, D.S. excitedly said: "all right, right there! See that dude right there," pointing to Appellant in the video. (Body Camera, 7:00.) Det. Anderson replayed the video for D.S., who again pointed to Appellant and said, "him." When asked if he was certain, D.S. responded without hesitation "Yeah, I'm one hundred and ten fucking percent positive." (Body Camera, 7:32.) He again pointed to Appellant and said, "right there!" (Body Camera, 7:45.)

{¶8} On April 18, 2025, Appellant was indicted on eight counts. The following were as a result of the January 1, 2024 shooting: one count of felonious assault, a felony of the second degree in violation of R.C. 2903.11(A), (D)(1)(a) with an attenuated three-year firearm specification in violation of R.C. 2941.145(A); one count of having weapons while under disability, a felony of the third degree in violation of R.C. 2923.13(A)(2), (B); and illegal possession of a firearm in a liquor permit premises, a felony of the third degree in violation of R.C. 2923.121(A), (E). The remaining charges pertain to an incident that occurred after Appellant had been indicted in this matter. Those charges were later dismissed as they formed the basis of a federal indictment against Appellant. Hence, only the first three counts are relevant, here.

**{¶9}** On July 23, 2024, Appellant filed a motion to suppress D.S.'s identification of Appellant as the shooter based on an argument that the one-person photo lineup violated R.C. 2933.83. The court held a hearing on the motion. On June 3, 2025, the trial court denied the motion.

**{¶10}** On September 2, 2025, Appellant entered a no contest plea. On October 9, 2025, the trial court accepted the jointly recommended sentence of five to six years of incarceration to run concurrent to any sentence Appellant would receive in his federal case. It is from this decision that Appellant timely appeals. For ease of understanding the parties' arguments, the relevant law will be discussed before addressing Appellant's arguments.

General Law

**{¶11}** The pertinent law involves procedures found within R.C. 2933.83(A)(6):

(A) As used in this section:

"Folder system" means a system for conducting a photo lineup that satisfies all of the following:

(a) The investigating officer uses one "suspect photograph" that resembles the description of the suspected perpetrator of the offense provided by the eyewitness, five "filler photographs" of persons not suspected of the offense that match the description of the suspected perpetrator but do not cause the suspect photograph to unduly stand out, four "blank photographs" that contain no images of any person, and ten empty folders.

(b)  The investigating officer places one "filler photograph" into one of the empty folders and numbers it as folder 1.

(c)  The administrator places the "suspect photograph" and the other four "filler photographs" into five other empty folders, shuffles the five folders so that the administrator is unaware of which folder contains the "suspect photograph," and numbers the five shuffled folders as folders 2 through 6.

(d)  The administrator places the four "blank photographs" in the four remaining empty folders and numbers these folders as folders 7 through 10, and these folders serve as "dummy folders."

(e)  The administrator provides instructions to the eyewitness as to the lineup procedure and informs the eyewitness that a photograph of the alleged perpetrator of the offense may or may not be included in the photographs the eyewitness is about to see and that the administrator does not know which, if any, of the folders contains the photograph of the alleged perpetrator. The administrator also shall instruct the eyewitness that the administrator does not want to view any of the photographs and will not view any of the photographs and that the eyewitness may not show the administrator any of the photographs. The administrator shall inform the eyewitness that if the eyewitness identifies a photograph as being the person the eyewitness saw the eyewitness shall identify the photograph only by the number of the photograph's corresponding folder.

(f) The administrator hands each of the ten folders to the eyewitness individually without looking at the photograph in the folder. Each time the eyewitness has viewed a folder, the eyewitness indicates whether the photograph is of the person the eyewitness saw, indicates the degree of the eyewitness's confidence in this identification, and returns the folder and the photograph it contains to the administrator.

(g) The administrator follows the procedures specified in this division for a second viewing if the eyewitness requests to view each of the folders a second time, handing them to the eyewitness in the same order as during the first viewing; the eyewitness is not permitted to have more than two viewings of the folders; and the administrator preserves the order of the folders and the photographs they contain in a facedown position in order to document the steps specified in division (A)(6)(h) of this section.

(h) The administrator documents and records the results of the procedure described in divisions (A)(6)(a) to (f) of this section before the eyewitness views each of the folders a second time and before the administrator views any photograph that the eyewitness identifies as being of the person the eyewitness saw. The documentation and record includes the date, time, and location of the lineup procedure; the name of the administrator; the names of all of the individuals present during the lineup; the number of photographs shown to the eyewitness; copies of each photograph shown to the eyewitness; the order in which the folders were

presented to the witness; the source of each photograph that was used in the procedure; a statement of the eyewitness's confidence in the eyewitness's own words as to the certainty of the eyewitness's identification of the photographs as being of the person the eyewitness saw that is taken immediately upon the reaction of the eyewitness to viewing the photograph; and any additional information the administrator considers pertinent to the lineup procedure. If the eyewitness views each of the folders a second time, the administrator shall document and record the statement of the eyewitness's confidence in the eyewitness's own words as to the certainty of the eyewitness's identification of a photograph as being of the person the eyewitness saw and document that the identification was made during a second viewing of each of the folders by the eyewitness.

(i) The administrator shall not say anything to the eyewitness or give any oral or nonverbal cues as to whether or not the eyewitness identified the "suspect photograph" until the administrator documents and records the results of the procedure described in divisions (A)(6)(a) to (g) of this section and the photo lineup has concluded.

## ASSIGNMENT OF ERROR

The trial court erred in denying Appellant's Motion to Suppress, in violation of Appellant's right to Due Process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution, because law enforcement did not follow proper

procedures for a photo lineup pursuant to R.C. 2933.83, because law enforcement's confrontation of the witness with Appellant as a suspect was unnecessarily suggestive of Appellant's guilt, and because the identification of Appellant was unreliable under all the circumstances.

**{¶12}** Appellant contends that Det. Anderson's decision to provide D.S. with a single photograph of only himself violates R.C. 2933.83. Appellant explains that the only way to overcome the strictures contained in the statute is for the state to prove that the photograph was not unduly suggestive. Appellant does argue that the photograph at issue was unduly suggestive, but his argument focuses more on the failure of the officers to provide an "excuse" for failing to comply with the statute.

**{¶13}** The state responds that D.S. had ample opportunity to view his shooter, knew exactly where Appellant was located, who he sat with, and was mostly accurate in his physical description. While hesitant in his identification from the photo, the state urges that D.S. was certain in his identification of Appellant from the video. Hence, D.S.'s identification of Appellant as his assailant was reliable.

**{¶14}** "[A] failure to comply with R.C. 2933.83 does not require suppression of the pretrial identification." *State v. McCrary*, 2014-Ohio-1468, ¶ 50 (7th Dist.). The statute does not require exclusion of the identification for failure to comply, but instructs the court to consider any failure to comply with the folder procedure in deciding suppression issues and to admit into evidence at trial law enforcement's failure to comply with the photo folder procedure. *Id*. at ¶ 51.

Case No. 25 MA 0099

{¶15} A reviewing court applies a two-prong test for evaluating the constitutionality of a pretrial identification. *State v. Hopkins*, 2021-Ohio-4632, ¶ 28 (7th Dist.), citing *McCrary* at ¶ 52.

> "When a witness has been confronted with a suspect before trial, due process requires a court to suppress her identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt *and* the identification was unreliable under all the circumstances." *State v. Murphy*, 91 Ohio St.3d 516, 534, 747 N.E.2d 765 (2001) (adding emphasis), quoting *State v. Waddy*, 63 Ohio St.3d 424, 438, 588 N.E.2d 819 (1992). "Thus, if the presentation was not unduly suggestive, the court need not proceed any further in the test, and likewise, if the court finds the identification reliable, it need not consider suggestiveness." *McCrary*, 7th Dist. No. 12 MA 135 at ¶ 53, citing *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 19 and *Murphy*, 91 Ohio St.3d at 534.

*Id.* at ¶ 29.

{¶16} When determining whether a photograph is unduly suggestive, courts have considered five factors: (1) the witness' opportunity to view the offender at the time of the offense, (2) the witness' degree of attention, (3) the witness' accuracy in the description of the offender, (4) the witness' level of certainty, and (5) the length of time between the offense and the identification. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

{¶17} Some considerations that have led to a finding of reliability have been: viewing the suspect and spending time with him or her before the incident, prior

knowledge of the person, and stating the ability to recognize the person and then being able to do so. *Hopkins* at ¶ 34.

{¶18} We begin with a discussion of the photograph shown to D.S. Appellant asserts this photograph was unduly suggestive of his guilt and that D.S.'s later identification of him from a video was, thus, unreliable. A review of this evidence in the record reveals the opposite is true. First, it is apparent that the photograph is of extremely poor quality. This photograph was shown to D.S. on a cell phone, and while the photograph admitted into evidence has been somewhat enlarged and quality of this photograph undoubtedly suffered somewhat in the enlargement, it is apparent that the details, such as they are in this photo, would not have been more clear. Typical of a bar setting, the lighting is very poor. While there was some sort of overhead light reflected off of the glossy finish of the bar counter, this only serves to throw the subject into deeper shadow. The darkness of the photo renders it impossible to see any details of the subject's (Appellant's) face. As deep shadow is being cast on Appellant's face, and his face seems to be turned, neither his facial features nor his profile can be detected. Thus, the image is limited to a dark silhouette of a portion of Appellant's head, revealing the general shape of part of a face and the outline of his hairstyle, which looks to be braided or in dreadlocks. Notably, the photo is so dark that it provides no depiction of his eyes, facial hair, or normal facial features. While the image depicts a man of probable African-American descent based on his hands, this photograph holds no value for any other identification purposes.

{¶19} The video, however, is of much clearer resolution and is better lit than the photograph. Notably, unlike the photograph, Appellant's face, profile, and facial features

are clearly observable. Appellant's dreadlocks are readily apparent underneath his hat and it is apparent he is wearing what appears to be a puffy black coat. When the officer handed the phone to D.S. and played the video, D.S., who had been unsure of his identification of Appellant from viewing the dark, shadowy figure in the photo, immediately and decisively recognized and identified Appellant without prompting.

{¶20} When earlier attempting to verbally describe the shooter, D.S. had trouble remembering exactly what the shooter was wearing and describing his facial features. This is unsurprising, as the woman he was attracted to held his attention far more than the male positioned next to her. Further, it is undoubtedly true D.S. was still in shock from the shooting. Nonetheless, D.S. expressed that while he struggled to describe the shooter and his clothing, he was confident that he would recognize him if shown an image.

{¶21} Placing D.S.'s initial description, his viewing of the photograph, and his viewing of the video into a timeline, it is apparent D.S. could clearly identify the shooter when looking at his face instead of his clothing. The police interview with the hospitalized victim was recorded on the officer's body camera and is also in this record. During the first part of the interview when D.S. was asked to verbally describe the shooter, he began by describing the location of the shooter and the women he was with that evening, including the woman he was attracted to. He described the area where he first saw the shooter as a section of the bar near the woman's restroom and that two women sat near a "light-skinned dude." (Body Camera, 2:30.) He explained that he found one of the women attractive, so he walked over to this area to talk to her. As to the shooter, he told the officer, "I can't necessarily remember, I think he was wearing grey pants or something of that sort. And I think he had dreads." (Body Camera, 2:51.) As he struggled to

describe the shooter's clothing, D.S.'s facial expressions reveal that he was making a great deal of effort to remember, and show that he felt some uncertainty. He explained that he walked away from the group to get money from a friend to buy the woman a drink and that when he returned, the male in the group pulled out a gun and shot him at point blank range in the stomach.

{¶22} When again asked about the shooter's clothing D.S. became frustrated and said "that's what I'm saying. It sucks because I really don't remember. I think he had dreads. I mean he was black, for sure. He had a red hoodie." (Body Camera, 4:10.) Asked again if he thought the man was wearing a red hoodie, he said "I think so." (Body Camera, 4:32.) He then stated: "I mean if I seen [sic] his face, I'd be able to tell you exactly who it is." (Body Camera, 4:37.)

{¶23} When shown the dark photograph, which depicts a blurred, shadowed figure and does not contain a clear view of the shooter's face, D.S. took a relatively long time, approximately fifteen seconds, trying to make out the figure in the photograph. He eventually responded: "I think so, that's not the bar owner, right?" After again looking at the photograph he said, "I think that is him." (Body Camera, 6:33.) We note that while Appellant was not wearing a red hoodie, the video does reveal there was another man at the bar that night who sat front and center at the bar and was very noticeable. This man stands out due to the bright red color of his hoodie. In the video, he can be seen constantly standing up and walking around hugging other patrons. It is hardly surprising that D.S. would clearly remember seeing a man in a red hoodie, and may have transposed this item of clothing with the shooter's actual garb, given that he admittedly did not pay much attention to his assailant's clothing.

Case No. 25 MA 0099

**{¶24}** However, once the officer handed D.S. his phone and played the video of the bar that night, D.S. immediately recognized Appellant. Within seconds of viewing this video, D.S. became excited and said: "all right, right there! See that dude right there," pointing emphatically to Appellant in the video. (Body Camera, 7:00.) D.S. displayed no hesitation in this identification and it was voiced strongly and loudly. There is no hesitation in his voice and his response was immediate upon seeing Appellant walk in front of the camera. Unlike his response to the poor-quality, shadowed photograph, D.S.'s confidence in his identification when viewing the video is obvious.

**{¶25}** On a replay, D.S. again pointed to Appellant and said, "him." When asked if he was certain, D.S. responded without hesitation "Yeah, I'm one hundred and ten fucking percent positive." (Body Camera, 7:32.) He once again pointed to Appellant and said, "right there!" (Body Camera, 7:45.)

**{¶26}** Beginning with D.S.'s opportunity to view the shooter at the time of the incident, he explained that he saw Appellant sitting next to two women, one of which he had an interest in pursuing, when he entered the bar. Hence, D.S. first saw Appellant the moment he walked into the building. (Body Camera, 2:23.) While Appellant may not have been the actual focus of D.S.'s attention, D.S. clearly noticed Appellant. D.S. went over to talk to the woman and attempted to engage in conversation with all three individuals, including Appellant. D.S. noted that even though he spoke to Appellant, he did not receive a response. As indicated within *Hopkins,* the ability of a victim to observe the offender prior to the incident is a relevant consideration. Here, D.S. clearly observed and interacted with Appellant prior to the shooting.

**{¶27}** It is also noteworthy that Appellant shot D.S. point blank in the stomach, hence, D.S. was looking right at the shooter in close proximity at the time. While D.S. was unquestionably more interested in one of the women, his statements reveal that he did remember his encounter with Appellant prior to the shooting and had time to observe him. He told officers that while he had difficulty remembering the shooter's clothing, he could definitely identity the man if shown his face. This factor weighs in the state's favor.

**{¶28}** Next, we turn to the witness's degree of attention. While obviously D.S. was more interested in a woman in the group, he clearly observed Appellant before the shooting and was confident that he could identify the shooter's face. Again, D.S. attempted some small talk with Appellant while talking to the woman, thus he did pay some attention to Appellant in the period before he was shot. This factor also weighs in favor of the state.

**{¶29}** Moving to the accuracy of D.S.'s prior description, we note that all three attempts at identification (his verbal discussion with the officers, viewing of the photograph, and viewing of the video) occurred basically at the same time within mere minutes. Regardless, it is readily apparent from D.S.'s attempts to describe the shooter verbally that he had a better look at, and memory of, Appellant's face than his clothing. There is little question that D.S. had difficulty describing the shooter's clothing and physical details, but he could describe the woman he was attracted to in detail. While Appellant described her male companion (Appellant) as appearing to be light-skinned when he first walked in and noticed the group, he specified that this man was "black, for sure." (Body Camera, 4:21.) D.S. also mentioned that Appellant had dreadlocks but

thought he wore a hood over his head. The video reveals Appellant wore some sort of dark colored hat over his dreadlocks, closely consistent with D.S.'s verbal description.

{¶30} When officers asked, first, for D.S. to describe the shooter, D.S. stated, "I can't necessarily remember, I think he was wearing grey pants or something of that sort." (Body Camera, 2:51.) D.S. continued to struggle with providing any physical description when asked by the officers on their arrival in D.S.'s hospital room. However, D.S. repeatedly said he got a better look at Appellant's face than his clothing. Even so, some shades of grey can be confused with black, especially in a not very well lit bar. D.S. conceded that he was uncertain about the shooter's clothing, using qualifiers such as "I can't necessarily remember," and "something of that sort." D.S.'s struggle to identify the color of Appellant's pants is unsurprising, as it appears that Appellant was sitting down at the bar when D.S. approached the group to talk to the woman, making his lower half less visible.

{¶31} Appellant also takes issue with D.S.'s description of his shooter as a "a light skinned dude." However, D.S. also described his shooter as "definitely black." And again, his reaction to seeing Appellant in the video was immediate and certain.

{¶32} This brings us to the fourth factor, the level of certainty. This factor is best discussed in three parts: D.S.'s verbal description, the photograph, and the video. Again, there is no question that D.S. struggled in trying to verbally describe Appellant. However, he made it clear that if shown an image containing the shooter's face, he would be able to recognize him. It is apparent that D.S. had a better look at the shooter's face than his body and clothing.

**{¶33}** This leads us to the photograph. Again, this photograph is so dark and shadowed as to be virtually useless for identification purposes, as the viewer cannot make out any facial features or even a profile. At best, the photo shows the person depicted may be dark skinned, has dreadlocks or braids, and is wearing a yellow shirt. When police showed this photograph to D.S. and asked him if it depicted the shooter, his response was hesitant and not immediate. He studied the photograph and after roughly fifteen seconds, he told police "I think so" and "that looks like him" but does not conclusively identify the man in the photograph as his shooter.

**{¶34}** When shown the video, however, within three seconds D.S. confidently stated "alright, right there" as he pointed to the phone screen. He continued "see that dude right there?" The video was replayed and D.S. again pointed at the screen and said "him!" When asked if he was certain, he responded without hesitation, "yeah, I'm a hundred ten fucking percent positive." (Body Camera, 7:31.) There is no question that D.S. conclusively and confidently identified Appellant from the video as the shooter.

**{¶35}** Appellant claims that the photograph could have predisposed D.S. to select Appellant in the video. There are two problems with this assertion. First, as we earlier pointed out, the photograph is of such poor quality and is so dark and shadowed it provides no distinguishing features of the man depicted. Following review of this photo, we can only conclude that it would not serve to assist any identification later obtained in the video. Second, in the photograph Appellant was wearing a bright yellow shirt. In the video, Appellant has on a black or dark colored coat, making the shirt under it barely visible. Thus, Appellant's appearance in the video is different from that of the photograph. This factor weighs in favor of the state.

Case No. 25 MA 0099

{¶36} As to the fifth, and final, factor, three days had passed from the shooting to the identification. An earlier attempt by police to interview D.S. failed due to D.S.'s serious medical condition following his shooting. We note that three days is unlikely to cause significant lapses in memory and was the first opportunity for police to conduct any interview of D.S. This factor also weighs in favor of the state.

{¶37} In summation, while the single photograph attempt at identification certainly did not fall within best police practices, this record shows it had no harmful suggestive effect on D.S.'s identification of Appellant. There is no image contained in the dark, poor quality photograph that could predispose D.S. to identify Appellant from the video, which was clearer and had better lighting. Regardless, it is apparent that D.S. was certain in his identification of Appellant in the video. While his verbal description of Appellant was not entirely accurate, D.S. consistently told the officer that he would recognize the shooter's face, if he saw it again, and had observed and could recognize his face much better than the shooter's attire.

{¶38} Based on all of the evidence contained in this record, the trial court did not err in admitting the victim's identification of Appellant as the perpetrator of the crimes against him. While D.S., the victim, struggled to verbally describe the man who shot him, many details of the man's companions and location correctly match Appellant's. In addition, D.S. knew his shooter was black and had dreadlocks, like Appellant's. While he was shown a single photo of Appellant and asked to make an identification of the perpetrator instead of being presented with a folder array of photos of various individuals as per the statute, it is apparent that this single photo was of such poor quality that it cannot be said to be "unduly suggestive" of Appellant's guilt. Coupled with D.S.'s certainty

as to his identification of Appellant when shown a video, which we note depicted several individuals, the record supports that D.S.'s identification, under all of the circumstances, was not unreliable and the trial court correctly overruled Appellant's motion to suppress.

Conclusion

**{¶39}** Appellant argues that a photograph and video shown to the victim were unduly suggestive and his identification of Appellant as the man who shot him was unreliable so as to require suppression. For the reasons provided, Appellant's argument is without merit and the judgment of the trial court is affirmed.

Robb, J. concurs.

Hanni, J. dissents with dissenting opinion.

Hanni, J., dissenting.

**{¶40}** With respect and regard to my colleagues, I must dissent from the majority opinion. I would find that the identification of Appellant should have been suppressed based on the *Biggers* factors.

**{¶41}** Because the identification procedure here was a one-person show up, it was inherently suggestive. The State concedes this issue. Detective Anderson presented D.S. with a single photograph that showed Appellant sitting alone at the bar. This procedure suggested Appellant was the perpetrator. Because the show up was suggestive, the *Biggers* factors and circumstance must be analyzed to determine the reliability of the identification.

**{¶42}** The first *Biggers* factor to consider is the opportunity of the witness to view the criminal at the time of the crime. D.S. stated that when he entered the bar he noticed two women and "a light-skinned dude" in the corner. (Interview Tr. 3). He thought the "white girl" was attractive so he went over to talk to her. (Interview Tr. 3). D.S. accurately described the tan jumpsuit that the girl was wearing. (Interview Tr. 3-4). As to the shooter, D.S. said, "I think he was wearing gray pants, or something of that sort" and "I think he had dreads." (Interview Tr. 4). D.S. then went to ask his cousin for some money so he could buy her a shot. (Interview Tr. 4). When he walked back over to the corner, the shooter shot him "pointblank" in his stomach. (Interview Tr. 4-5). D.S. did not say how much time he spent by the shooter and the two women. However, from his description of the events, it appears to have been a short time but long enough to have a brief conversation. Thus, I would find the first factor does not weigh heavily in favor of or against the reliability of the identification.

Case No. 25 MA 0099

**{¶43}** The second *Biggers* factor is the witness's degree of attention. D.S.'s focus at the time was on the attractive woman for whom he wanted to purchase a shot. He was able to accurately describe her jumpsuit outfit and her light hair. (Interview Tr. 3-4). But when asked by the detective what the shooter looked like, D.S. was uncertain:

DET./SGT. ANDERSON: Uh-huh. So kind of describe to me what the guy that shot you was wearing or what he looked like, or anything distinguishable.

[D.S.]: That's what I'm saying. It sucks 'cause I really don't remember. I think he had dreads.

DET./SGT. ANDERSON: Okay.

[D.S.]: I mean, he was black, for sure. He had a red hoodie.

DET./SGT. ANDERSON: He was wearing a red hoodie?

[D.S.]: Yeah.

DET./SGT. ANDERSON: Okay.

[D.S.]: I think so. I mean, if I seen his face, I'd be able to tell you exactly who it is.

DET./SGT. ANDERSON: Could you tell what color shirt he had on, anything like that?

[D.S]:  Probably.  This shit got my fuckin' nerves going.

DET./SGT. ANDERSON:  Just take your time and think.

Was he wearing a hat, anything like that?  Was – was –

[D.S.]:  He had a hoodie on.

DET./SGT. ANDERSON:  A hoodie on.  He had the hoodie pulled up?

[D.S.]:  And he was sitting with a mixed girl and a white girl.

DET./SGT. ANDERSON:  By chance is this him [detective shows D.S. the photo of Appellant sitting at the bar]?

[D.S.]:  I think so.  That's not the bar owner right?

DET./SGT. ANDERSON:  No.

[D.S.]:  No?

(Interview Tr. 5-6).

{¶44} D.S.'s statements to the detective indicate that he was not paying a great deal of attention to the man who would shoot him. Instead, he was focused on the attractive woman.  He accurately described her clothing and hair.  But he was unsure when describing the man who shot him, stating "I really don't remember."  Thus, I would find the second factor weighs against the reliability of the identification.

**{¶45}** The third *Biggers* factor is the accuracy of the witness's prior description of the criminal. This is the factor that weighs most in favor of suppression. D.S. first described the shooter as wearing "gray pants, or something of that sort." (Interview Tr. 4). He also described him as "a light-skinned dude". (Interview Tr. 3). D.S. said that he thought the shooter "had dreads." (Interview Tr. 4, 5). He further described the shooter as "black, for sure" and stated that he was wearing a red hoodie. (Interview Tr. 5). The detective asked D.S. if the shooter was wearing a hat and D.S. again stated that he was wearing a hoodie. (Interview Tr. 6). But later, D.S. said the shooter was wearing a hat. (Interview Tr. 8).

**{¶46}** This description of the shooter matches Appellant only insofar as Appellant is a black man with a dreadlock hair style. But the rest of D.S.'s description, detailing what the shooter was wearing and the shooter's skin tone, does not describe Appellant and what he was wearing that night. The image of Appellant sitting at the bar that night shows that he was wearing a yellow short-sleeve tee shirt and black pants. And the video from security taken after the shooting shows that he has a black jacket over his yellow tee shirt and a black hat. None of these items are similar to D.S.'s prior description of the shooter wearing a red hoodie, gray pants, and no hat. Moreover, D.S. said that the shooter was a black man but "a light-skinned dude". The photograph of Appellant, however, shows that Appellant's skin is not light as Appellant described. Additionally, the video reveals there was another man at the bar that night who was wearing a red hoodie. This man was white and had long hair. Based on the multiple inconsistencies between D.S.'s description of the shooter and Appellant's actual appearance that night, I would find the third factor weighs against the reliability of the identification.

Case No. 25 MA 0099

**{¶47}** The fourth *Biggers* factor is the witness's level of certainty at the confrontation. Early on in the interview, D.S. told Detective Anderson, "I mean, if I seen his face, I'd be able to tell you exactly who it is." (Interview Tr. 5). Detective Anderson showed D.S. the photograph of Appellant sitting at the bar. (Interview Tr. 6; Ex. 2). The detective then continued questioning D.S.:

DET./ SGT. ANDERSON: By chance, is this him?

[D.S.]: I think so. That's not the bar owner, right?

DET./ SGT. ANDERSON: No.

[D.S.]: No?

UNIDENTIFIED FEMALE: He was communicating a lot with the bar owner that night, too, chitchatting.

[D.S.]: Yeah, but - -

UNIDENTIFIED FEMALE: I just don't want - -

DET./ SGT. ANDERSON: Was he there for a long time prior to everybody else getting there?

[D.S.]: I'm not for sure 'cause I believe we came in probably about 30 - - 30 minutes to - - that looks like him. And I don't understand how he got in with a gun 'cause everybody else got pat down.

DET./SGT. ANDERSON:  Here's a video of right after.

[D.S.]:  All right.  Right there.  See that dude right there?

DET./SGT. ANDERSON:  In the black - - in the black coat?

[D.S.]:  See that girl?

DET./SGT. ANDERSON:  Yeah.

[D.S.]:  Him.

DET./SGT. ANDERSON:  Okay.  That's him, for sure?

UNIDENTIFIED FEMALE:  You're positive?

[D.S.]:  Yeah, I'm a 110 fuckin' percent positive.

UNIDENTIFIED FEMALE:  Okay.

(Interview Tr. 6-8).

{¶48} Detective Anderson testified that when he first showed D.S. the photograph of Appellant, D.S. "wasn't exactly sure" if it was the shooter.  (Suppression Tr. 10).  This was despite the fact that D.S. stated if he saw the shooter's face he would be able to tell the detective exactly who the shooter was.  In fact, D.S. inquired of the detective if the person in photograph might be the bar owner.  The detective then showed D.S. the surveillance video on his phone and D.S. pointed to Appellant as the shooter.  (Suppression Tr. 11, 14-15).  But this was after Detective Anderson had shown D.S. the

photograph of Appellant sitting at the bar. Thus, D.S. was likely predisposed to look for Appellant in the video after seeing him in the photograph. Moreover, in the video Appellant's face is less clear than in the photograph. This further supports the conclusion that D.S., whether consciously or unconsciously, was looking for Appellant in the video. Thus, I would find the fourth factor weighs against the reliability of the identification.

**{¶49}** Also worth pointing out here is the fact that an unidentified female, whom Detective Anderson testified was D.S.'s mother, interjected her comments into D.S's identification. (Suppression Tr. 32-33). When D.S. asked if the photograph was of the bar owner, his mother indicated that either D.S. or Appellant, it unclear to which one she was referring, was "chitchatting" with the bar owner that night. (Interview Tr. 6-7). She also asked D.S. if he was sure in his identification of the shooter. (Interview Tr. 7). The detective stated that D.S.'s father was also in the hospital room during the interview. (Suppression Tr. 33). Their presence and comments may have pressured D.S.'s identification.

**{¶50}** The fifth and final *Biggers* factor is the length of time between the crime and the confrontation. The shooting took place in the early morning hours of January 1, 2024. Detective Anderson showed D.S. the photo of Appellant on January 4, 2024, while he was still in the hospital recovering from the shooting. Thus, only three days had passed since the shooting. This factor weighs likely weighs in favor of reliability of the identification.

**{¶51}** It is relevant to note, however, that Detective Anderson attempted to visit D.S. in the hospital on January 2, 2024, the day after the shooting. (Suppression Tr. 18-19). But due to D.S.'s medical condition at the time, the detective was unable to actually

visit with D.S. (Suppression Tr. 18-19). When Detective Anderson interviewed D.S., D.S. was still in lying in bed in his hospital room. (Suppression Tr. 23). Detective Anderson testified that he imagined that D.S. was medicated at that time, but the detective did not ask him about any medications. (Suppression Tr. 23).

{¶52} In sum, I would find three out of the five *Biggers* factors weigh against the reliability of D.S.'s identification of Appellant and one factor does not weigh heavily in favor of or against the reliability of the identification. When D.S. was first shown the clear photograph of Appellant, he was uncertain if that was the shooter. He even questioned whether the photograph may have been of the bar owner. He then picked Appellant out in the video, which was not a clear view of Appellant. This suggested that D.S. was looking for the man in the photograph instead of independently looking for the shooter in the video. Moreover, D.S. initially told the detective that he did not really remember what the shooter looked like. He stated later that the shooter wore a red hoodie and gray pants. D.S. reiterated that the shooter was wearing a red hoodie later in his interview. Appellant was not wearing a red hoodie and gray pants that night. Instead, Appellant was wearing a yellow tee shirt, black jacket, and black pants. There was another man in the video at the bar who was in fact wearing a red hoodie. Additionally, D.S.'s mother made various comments during the interview which could have served to bolster D.S.'s belief that his identification was correct. Furthermore, D.S. was still in the hospital recovering from his gunshot wound. Detective Anderson stated that on January 2, 2024, D.S. was unable to be interviewed due to his medical condition. Two days later, when the detective was able to interview D.S., the detective stated that D.S. was likely on medication but he did not ask D.S. about this.

Case No. 25 MA 0099

**{¶53}** For all of these reasons, I would find Appellant met his burden of demonstrating D.S.'s identification was unreliable under the totality of the circumstances. Therefore, I would find the trial court should have granted the motion to suppress D.S.'s identification of Appellant.

_____

For the reasons stated in the Opinion rendered herein, Appellant's assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed. Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

**<u>NOTICE TO COUNSEL</u>**

**This document constitutes a final judgment entry.**